UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) |
| Plaintiff, | ) Civil Action No. ) |
| v. | ) Judge: ) |
| STEVEN M. DOMBROWKSI, | ) ) Jury Trial Demanded |
| Defendant, | ) ) |
| and | ) ) |
| LISA L. FOX, | ) ) |
| Relief Defendant. | ) ) |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("Commission"), for its complaint, alleges as follows:

### Summary

1. This case arises from illegal insider trading by Defendant Steven M. Dombrowski ("Dombrowski") in the brokerage account of his wife, Relief Defendant Lisa L. Fox ("Fox"). Dombrowski worked in the corporate audit department for Allscripts Healthcare Solutions, Inc. ("Allscripts"). In April 2012, Dombrowski learned that Allscripts' first quarter financial results were much worse than had been expected, and that Allscripts would miss its earnings target. In violation of federal law, Allscripts insider trading policies, and his duty of trust and confidence owed to Allscripts, Dombrowski used this important, non-public information to trade Allscripts securities in his wife's account, generating illicit profits in excess of $286,000.

2.     By engaging in this conduct, Dombrowski violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Fox benefited from her husband's violations as Dombrowski's illegal trading and the resulting illegal profits were in her account.

## Jurisdiction and Venue

3.     The Commission brings this action pursuant Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v], and Section 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(e) and 78u-1].

4.     The Court has subject matter jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v)] and Sections 21(d), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(e), 78u-1 and 78aa].

5.     This Court has personal jurisdiction over Dombrowski and Fox because Dombrowski and Fox reside in this district.

6.     Venue is proper in this district because Dombrowski and Fox reside in this district, and because many of the acts, transactions and conduct which constitute the violations alleged in this complaint occurred within this district.

## Defendant

7.     Dombrowski is 49 years-old and resides in Chicago, Illinois. Dombrowski is married to relief defendant Fox. Dombrowski is a Certified Public Accountant, and has a Bachelor of Business Administration in Accountancy degree. Before working at Allscripts, Dombrowski worked in the corporate audit department of several public companies, and also previously worked as an auditor at a major public accounting firm.

**Relief Defendant**

8. Fox resides in Chicago, Illinois, and is married to Dombrowski. In 2008, Fox opened a securities account at Charles Schwab & Co. Inc. ("Schwab"), and in 2009, Fox gave Dombrowski authority to trade securities in her Schwab account.

**Other Relevant Entity**

9. Allscripts is a Delaware corporation with its principal place of business in Chicago, Illinois. Allscripts sells and services software and related hardware to various healthcare providers. Allscripts' common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is traded on the NASDAQ exchange under the ticker symbol "MDRX." Options on Allscripts' common stock trade on a number of securities exchanges, including the Chicago Board Options Exchange.

**Background**

10. In 2012, Dombrowski worked in Allscripts' corporate audit department as Director of Corporate Audit. Allscripts' corporate audit department was responsible for the ongoing auditing of Allscripts' accounting functions, including the testing of Allscripts' accounting systems responsible for producing its publicly reported financial results.

11. Allscripts' corporate audit department was run by, and Dombrowski reported to, the Vice-President of Corporate Audit. Dombrowski supervised at least two other Allscripts internal auditors, including "Employee A."

12. Dombrowski was based in Chicago. Employee A was based in Houston. As part of their work, Dombrowski and Employee A talked frequently by telephone.

13. Although some accounting personnel were based in Chicago, most of Allscripts' accounting group was located in Raleigh, North Carolina. As part of their work, Dombrowski

3

and Employee A frequently met with and talked to the employees in Allscripts' accounting group that were responsible for producing Allscripts' financial results.

14. In addition, Dombrowski and the others in the corporate audit department had access to the company's financial systems and the data that went into preparing its financial results.

### Allscripts' Blackout Periods and Insider Trading Policy

15. Allscripts routinely sent email notices of trading blackouts (i.e., periods during which employees were prohibited from buying or selling Allscripts securities) to its employees in advance of each quarterly close. Dombrowski received a number of these emails during 2011 and early 2012. These emails contained a general discussion of Allscripts' insider trading prohibitions and the blackout period, and contained a hyperlink to the complete Allscripts insider trading policy.

16. Allscripts' insider trading policy prohibited employees from buying or selling Allscripts securities if they had material nonpublic information. The policy contained a section titled "Definition of Material Non-Public Information" which listed "common examples" of material information, including "projections of future earnings or losses or other earnings guidance" and "earnings that are inconsistent with the consensus expectations of the investment community." Allscripts' insider trading policy also stated that employees were not permitted to sell short Allscripts stock or to trade Allscripts options.

17. On March 9, 2012, Allscripts sent an email to its employees, including Dombrowski, advising them that a trading blackout would begin on March 14 after the market closed, and that the blackout would continue until two business days after Allscripts announced its financial results for the first quarter. This email also stated that "Allscripts prohibits insider

4

trading of any kind. Insider trading occurs if you know material non-public information about a company (whether it is MDRX or another company) and you trade on that information or tip others about it before the information is released publicly." This email also stated that "[m]aterial information is news that can affect a company's stock price, such as . . . earnings that are better or worse than expected." This email contained a hyperlink to Allscripts' complete insider trading policy.

18. On March 14, 2012, Allscripts sent another email to its employees, including Dombrowski, stating the same information about insider trading as contained in the March 9, 2012 email, and notifying them that the trading blackout would begin at the end of that day. This email also contained a hyperlink to Allscripts' complete insider trading policy.

### Dombrowski's Insider Trading

19. On March 31, 2012, Allscripts' first quarter for 2012 ended.

20. On April 2, 2012, Allscripts began its formal quarterly close process for first quarter 2012.

21. On April 9, 2012, Allscripts' accounting department circulated preliminary consolidated U.S. GAAP balance sheet and profit and loss figures within the accounting group, and also to some employees outside the accounting group, including Employee A. Later that day, Employee A traveled to Raleigh to meet with Allscripts accounting personnel.

22. On April 10, 2012, Allscripts accountants reviewed and circulated preliminary consolidated financial results to other Allscripts senior accounting personnel, including Allscripts' Chief Financial Officer (the "CFO"). These financial results showed that Allscripts would report significantly worse than expected financial results for its first quarter and miss its earnings target.

23. Also on April 10, Employee A met in Raleigh with accounting personnel and learned that Allscripts' first quarter results were significantly worse than expected and that Allscripts would miss its first quarter earnings targets. Employee A and Dombrowski then talked by telephone, and discussed Allscripts' poor first quarter financial results.

24. Also on April 10, 2012, Dombrowski began his insider trading by selling short 1,000 shares of Allscripts stock, and purchasing 50 Allscripts May $15 put option contracts. Equity put options, such as the ones Dombrowski purchased, give the buyer the right, but not the obligation, to sell a company's stock at a set price (the "strike price") for a certain period of time (through "expiration"). In general, a trader buys a put option when the stock price is expected to fall.

25. Dombrowski made each of these trades, and all of Dombrowski's other trades detailed below, in his wife's Schwab account. These trades, and each of Dombrowski's other trades detailed below, would be profitable if Allscripts stock fell from its current price.

26. During the period of Dombrowski's trades, Allscripts' stock price traded in a narrow range between $15.57 and $16.66 per share.

27. On April 11 and 12, 2012, Allscripts' CFO and other senior accounting staff continued their review of the preliminary consolidated financial results. On April 11, Dombrowski purchased 50 Allscripts May $15 put option contracts, and the next day he purchased an additional 100 May $15 put option contracts

28. On April 13, 2012, Allscripts' accounting department circulated a draft Form 10-Q to senior accounting personnel. Form 10-Q is a form that public companies are required to file each quarter with the Commission that, among other things, informs the public of the company's

quarterly financial results. Also on April 13, Dombrowski purchased another 50 Allscripts May $15 put option contracts.

29. On April 15, 2012, Allscripts' Audit Committee of the Board of Directors met to discuss the preliminary consolidated financial results and the timing of the release of these results to the public.

30. On April 16, 2012, Allscripts' full Board of Directors learned of the preliminary consolidated financial results. Also on April 16, 2012, Dombrowski purchased 50 Allscripts May $16 put option contracts.

31. On April 17, 2012, Allscripts' Executive Operating Group, comprised of the senior-most members of management, learned of the preliminary consolidated financial results. Also, a draft of Allscripts' earnings press release was circulated to Allscripts' senior accounting personnel. In addition, Allscripts' preliminary financial results were provided to its outside auditors. Also on April 17, Dombrowski purchased 50 Allscripts May $15 put option contracts.

32. On April 18, 2012, Allscripts' Audit Committee met to discuss the preliminary consolidated financial results and the planned earnings release date.

33. On April 19, 2012, Dombrowski participated in a corporate audit department conference call in which his supervisor, the Vice-President of corporate audit, gave a summary of the April 18 Audit Committee meeting. As part of that summary, Dombrowksi's supervisor stated that Allscripts would miss its first quarter earnings target, and the miss might be by a significant amount. Later that day, Dombrowski purchased 17 Allscripts May $16 put options contracts.

34. On April 23, 2012, Allscripts' full Board of Directors met to discuss the first quarter financial results. In addition, Dombrowski and Employee A traveled to Raleigh to meet

7

with Allscripts accounting personnel. Also on April 23, Dombrowski entered an order to purchase 33 Allscripts May $16 put option contracts, and that order was executed the following day.

35. On April 24, 2012, Allscripts' Board of Directors met again to discuss the first quarter financial results. Dombrowski and Employee A were in Raleigh for the week and met with accounting department personnel. During these meetings, Employee A learned that Allscripts' earnings would be approximately 12 cents per share (versus analysts' expectations of 24 cents per share). Dombrowski and Employee A discussed Allscripts' earnings throughout the week while in Raleigh.

36. On April 25, 2012, Allscripts completed a draft earnings press release for its first quarter financial results and provided the draft to its outside auditors. That day, Dombrowski purchased 50 Allscripts May $17 put option contracts.

37. On April 26, 2012, Dombrowski, who was still in Raleigh, purchased 50 Allscripts May $15 put option contracts and 10 Allscripts May $17 put option contracts.

38. Later that day, and after the close of regular securities trading, Allscripts released its first quarter financial results via an earnings teleconference. At this teleconference, Allscripts disclosed results which were significantly worse than expected by the market, including earnings of approximately 50% of what analysts had expected. Allscripts also announced that its CFO would soon leave the company for another job, and that the Chairman of the Board of Directors and several others members of the Board had resigned.

39. This teleconference was the first time that this negative information was disclosed to the public, and the release of such information caused Allscripts' stock price to plummet. By

the end of the following trading day, April 27, 2012, Allscripts' common stock closed down $5.72, or 35.7%, from the previous day's close.

40. Dombrowski, who was still in Raleigh, listened to the April 26 earnings teleconference. Shortly thereafter, in after-hours trading, Dombrowski purchased 1,000 shares of Allscripts stock to close his short position, realizing profits of $6,945.75.

41. On April 27, 2012, in the morning, Dombrowski sold all of the open options positions in his wife's accounts (510 contracts in all), realizing profits of $279,265.80.

42. In total, Dombrowski's insider traded resulted in $286,211.55 in illegal profit in Fox's account.

## COUNT ONE

## Violations of Section 17(a)(1) of the Securities Act

43. The Commission incorporates by reference the allegations in paragraphs 1 through 42 as though fully set forth herein.

44. Dombrowski knew, or was reckless in not knowing, that the information detailed above about Allscripts' first quarter financial results was confidential, material and nonpublic.

45. Dombrowski breached the fiduciary duty of trust and confidence that he owed to Allscripts by trading in Allscripts securities using that information.

46. By the conduct described above, Dombrowski, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly employed devises, schemes or artifices to defraud.

47. Dombrowski acted knowingly or recklessly when he engaged in the fraudulent conduct described above.

48. By reason of the foregoing, Dombrowski violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act

49. The Commission incorporates by reference the allegations in paragraphs 1 through 42 as though fully set forth herein.

50. Dombrowski knew, or was reckless in not knowing, that the information detailed above about Allscripts' first quarter financial results was confidential, material and nonpublic.

51. Dombrowski breached the fiduciary duty of trust and confidence that he owed to Allscripts by trading in Allscripts securities using that information.

52. Dombrowski, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser of securities.

53. By reason of the foregoing, Dombrowski violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

54. The Commission incorporates by reference the allegations in paragraphs 1 through 42 as though fully set forth herein.

55. Dombrowski knew, or was reckless in not knowing, that the information detailed above about Allscripts' first quarter financial results was confidential, material and nonpublic.

56. Dombrowski breached the fiduciary duty of trust and confidence that he owed to Allscripts by trading in Allscripts securities using that information.

57. Dombrowski, in connection with the purchase or sale of securities, directly or indirectly, by the use of the means or instrumentalities of interstate commerce or of the mails: (a) used or employed a device, scheme, or artifice to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) and engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon the purchasers and prospective sellers of such securities.

58. Dombrowski acted knowingly or recklessly when he engaged in the fraudulent conduct described above.

59. By reason of the foregoing, Dombrowski violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

## COUNT IV

### Equitable Claim Against Relief Defendant Fox

60. The Commission incorporates by reference the allegations in paragraphs 1 through 42 as though fully set forth herein.

61. Relief Defendant Fox, directly or indirectly, received funds or benefited from the use of such funds, which are the proceeds of the unlawful activity alleged above.

62. Relief Defendant Fox has no legitimate claim to such funds received, or from which she otherwise benefited from, directly or indirectly.

63. The Commission is entitled to an order, pursuant to common law equitable principles and pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], requiring Fox to disgorge all of the proceeds of Dombrowski's illegal activities that she has received or from which she has benefited, either directly or indirectly.

## **RELIEF REQUESTED**

WHEREFORE, the Commission requests that this Court enter a judgment:

A. Finding that Dombrowski committed the violations alleged against him herein;

B. Permanently enjoining Dombrowski from further violations of Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5];

C. Ordering Dombrowski to disgorge all ill-gotten gains obtained through the unlawful conduct described above, plus prejudgment interest thereon, with such disgorgement to be jointly and severally imposed with Relief Defendant Fox.

D. Ordering Relief Defendant Fox to disgorge all funds she received, directly or indirectly, from Dombrowski's unlawful conduct, together with prejudgment interest thereon, with such disgorgement to be joint and severally imposed with Defendant Dombrowski;

E. Ordering Defendant Dombrowski to pay an appropriate civil monetary penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and

F. Granting such other and additional relief as this Court deems just and proper.

## JURY DEMAND

The Commission requests a trial by jury.

Respectfully Submitted,

/s/ Benjamin J. Hanauer
Benjamin J. Hanauer (Illinois Bar No. 6280156)
Kristopher S. Heston (Illinois Bar No. 6204816)
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
175 West Jackson Boulevard, Suite 900
Chicago, Illinois 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-3381
Email: hanauerb@sec.gov
hestonk@sec.gov

Dated: January 28, 2014